UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHRISTOF WESTENFELDER and AXEL ZANDER, ) ) ) ) Plaintiffs, ) ) v. ) ) NOVO VENTURES (US), INC., SV ) LIFE SCIENCES ADVISERS, LLC, ) ALLOCURE, INC., LUTZ GIEBEL, ) THOMAS DYRBERG, and ROBERT ) BRENNER, ) ) Defendants. ) ) | CIVIL ACTION NO. 11-10939-WGY |

<u>MEMORANDUM</u>

YOUNG, D.J.                                                                 July 14, 2011

**I. INTRODUCTION**

    Christof Westenfelder ("Westenfelder") and Axel Zander ("Zander") (collectively, the "Plaintiffs") bring this suit against Novo Ventures (US), Inc., SV Life Sciences Advisers, LLC, Allocure Inc. ("Allocure"), Lutz Giebel, Thomas Dyrberg, and Robert Brenner (collectively, the "Defendants"). The Plaintiffs originally asserted three causes of action, each against a subset of the Defendants, but they have since amended their complaint to state five causes of action. Among these claims, only two are relevant to the present motions: Count IV asserts that Allocure breached a Stock Restriction Agreement that it entered into with

the Plaintiffs, and Count V seeks a declaratory judgment that the claim in Count IV is not subject to compulsory arbitration.[1]

The Plaintiffs filed a motion for a preliminary injunction to prevent such arbitration, and Allocure filed a motion to compel arbitration. After considering the memoranda submitted by the parties and the arguments made at oral argument, this Court allowed the Plaintiffs' motion, denied Allocure's motion, and enjoined arbitration of the rights asserted in Count IV. Order, ECF No. 10. This memorandum explains the Court's reasoning for that decision.

**II. FACTS**

    **A. Consulting Agreements**

Westenfelder and Zander are medical doctors who, together, specialize in developing stem-cell related treatments for acute kidney injury. Am. Compl. ¶¶ 10-12. In 2004, they formed a company named Nephrogen, LLC ("Nephrogen"), to continue their research and to exploit their inventions commercially. Id. ¶¶ 15-16. In 2005, Gambro, a global medical technology company, agreed to become an investor in Nephrogen. Id. ¶ 17. As part of the investment arrangement, in October 2005, the Plaintiffs entered into Consulting Agreements with Nephrogen. See Westenfelder Aff., Ex. B, ECF Nos. 4-2, -3 ("Consulting

---

[1] The counts identified here refer to the Amended Complaint. See ECF No. 11. In the original complaint, these same claims were Counts II and III, respectively. See ECF No. 1.

2

Agreements"). The Consulting Agreements set forth, inter alia, the services that would be performed by the Plaintiffs, the compensation they would receive, provisions concerning confidential information, and rules concerning the assignment of patents for any inventions made. Id. The Consulting Agreements provided that they could "be terminated by [Nephrogen] with or without cause at any time upon thirty (30) days prior notice." Id. ¶ 8(a). They also included an arbitration clause mandating arbitration of "[a]ny claim or controversy arising out of or relating to this Agreement, or breach thereof." Id. ¶ 19.

**B. Stock Restriction Agreements**

In 2008, Gambro sold its interest in Nephrogen to Novo Ventures (US), Inc. and SV Life Sciences Advisers, LLC, who invested significant additional funds in the company (the "Series A Financing"). Am. Compl. ¶ 20. Nephrogen was incorporated and renamed AlloCure, Inc. Id. The headquarters of AlloCure was moved from Salt Lake City, Utah, to Burlington, Massachusetts, and a new CEO was hired. Id. ¶ 24. The Consulting Agreements were extended at this time. See Westenfelder Aff., Ex. C, ECF Nos. 4-4, -5 ("Consulting Extensions"). The new investors also required the Plaintiffs to execute Stock Restriction Agreements, which gave AlloCure the option to re-purchase the shares owned by the Plaintiffs in certain circumstances. Am. Compl. ¶ 30; see also Westenfelder Aff., Ex. D, ECF Nos. 4-6, -7 ("Stock

Restriction Agreements"). Of relevance to this suit, the Stock Restriction Agreements provided that if the Plaintiffs were terminated for cause, AlloCure would have an option to purchase all of the Plaintiffs' shares "at a price per Share equivalent to the proportional price per Unit originally paid by [the Plaintiffs] and as calculated in accordance with the Conversion Ratio." Stock Restriction Agreements ¶ 2(a). If the Plaintiffs were terminated without cause, AlloCure would have an option to purchase unvested shares at a price equivalent to the proportional price paid by the Plaintiffs and vested shares at fair market value. Id. ¶ 2(b). The agreements referred to the 2008 Stock Incentive Plan (the "Incentive Plan") to define "cause." Id. ¶ 2(a). That document specified that cause included the Plaintiffs' willful failure to perform their duties, fraud or embezzlement, unauthorized disclosure of proprietary information, or willful breach of any obligations in a written agreement with AlloCure. Westenfelder Aff., Ex. E, ECF No. 4-8 ("Incentive Plan").

**C. Termination**

Following a dispute regarding the newly hired CEO, AlloCure terminated the Plaintiffs on December 6, 2010. Am. Compl ¶ 27-29. The CEO, Robert Brenner ("Brenner"), sent a letter to each of the Plaintiffs notifying them of their terminations. See Westenfelder Aff., Ex. F, ECF Nos. 4-9, -10 ("Termination

Letters"). Both letters stated: "For purposes of [the] Stock Restriction Agreement, AlloCure, Inc. will consider your termination not for 'Cause' as defined in the Stock Restriction Agreement." Id. at 1.

**III. ANALYSIS**

**A. Legal Standard**

Under Delaware law,[2] public policy strongly favors arbitration. See Graham v. State Farm Mut. Auto. Ins. Co., 565 A.2d 908, 911 (Del. 1989). When a court considers the issue of arbitrability, "doubts should be resolved in favor of arbitrability when a reasonable interpretation in that direction exists." Ishimaru v. Fung, No. Civ. A. 929, 2005 WL 2899680, at *13 (Del. Ch. Oct. 26, 2005).

The Delaware Arbitration Act renders arbitration clauses in contracts fully enforceable, except to the extent that grounds exist to revoke the contract. See Del. Code Ann. tit. 10, § 5701 (2011). Because "arbitration is a mechanism of dispute resolution created by contract," however, a court cannot require any party to proceed to arbitration on a claim when they have not agreed to such a course. Wilcox & Fetzer, Ltd. v. Corbett &

---

[2] The Consulting Agreements state that they will be governed by Utah law. Consulting Agreements ¶ 15. The Stock Restriction Agreements, however, state that they will be governed by Delaware law. Stock Restriction Agreements ¶ 10(i). At the hearing, the parties agreed that the issue of arbitrability ought be decided under Delaware law.

5

Wilcox, No. Civ. A. 2037-N, 2006 WL 2473665, at *3 (Del. Ch. Aug. 22, 2006) (quoting Parfi Holding AB v. Mirror Image Internet, Inc., 817 A.2d 149, 156 (Del. 2002)).

Interpretation of an arbitration clause proceeds in two steps:

> First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.

Majkowski v. American Imaging Mgmt. Servs., LLC, 913 A.2d 572, 582 (Del. Ch. 2006) (quoting Parfi, 817 A.2d at 155). The relevant analysis concerns the rights being asserted, not the conduct at issue. See Parfi, 817 A.2d at 156.

**B. Applicability of the Arbitration Clause**

**1. Scope of Clause**

The arbitration clause at issue here is found only in the Consulting Agreements; the Stock Restriction Agreements have no similar provision. The clause states that "[a]ny controversy or claim arising out of or relating to [the Consulting Agreements], or breach thereof, shall be finally settled under the appropriate Arbitration Rules of [the] American Arbitration Association."

Consulting Agreements ¶ 19. At the first step of the two-step analysis, this Court rules that this arbitration clause is broad in scope. Cf. Parfi, 817 A.2d at 155 (holding that clause requiring arbitration of all disputes "arising out of or in connection with" the contract was broad in scope); Majkowski, 913 A.2d at 583 (holding that arbitration clause requiring arbitration of all disputes that "arise out of" or "relate to" the contract was broad in scope).

**2. Consulting Agreement Rights or Obligations**

Turning to the second step, this Court must determine whether the Plaintiffs' claim in Count IV "touch[es] on contract rights or contract performance" under the Consulting Agreement. Majkowski, 913 A.2d at 582. "The issue is whether [Count IV] implicate[s] any of the rights and obligations provided for in the [Consulting Agreements]." Parfi, 817 A.2d at 155. The Court concludes that it does not, and thus the arbitration clause is not applicable.

Count IV asserts a claim under the Stock Restriction Agreements: the Plaintiffs assert that they were terminated without cause, that AlloCure exercised its option to purchase their vested shares of stock, but that AlloCure did not properly, in good faith, determine the fair market value of those shares as required by the Stock Restriction Agreeements. See Am. Compl. ¶¶

52-55, ECF No. 11.  On its face, this claim concerns only the valuation of the Plaintiffs' stock and does not implicate any rights or obligations under the Consulting Agreements.  Allocure, however, advances two arguments in favor of compelling arbitration nonetheless.

First, AlloCure argues that Count IV is "so 'interwoven' with the Consulting Agreement that [it] cannot stand alone, and must be subject to arbitration."  AlloCure's Opp'n Mot. Prelim. Inj. 12, ECF No. 9 ("AlloCure Opp'n") (citing Parfi, 817 A.2d at 156 n.20).  Specifically, AlloCure argues that determining whether the Plaintiffs were terminated for cause or without cause will require the Court (or arbitrator) to adjudicate the parties' rights and obligations under the Consulting Agreements.  Id.

At first blush, this argument is appealing.  The Stock Restriction Agreements provide for different stock buy-back prices based on whether the Plaintiffs were terminated for cause or without cause.[3]  See Stock Restriction Agreements ¶ 2(a)-(b).  "Cause" is defined in the Incentive Plan, and one possible justification for a for-cause termination is that the Plaintiffs "willful[ly] breach[ed] . . . any of [their] obligations under

---

[3] If the Plaintiffs were terminated for cause, AlloCure would have an option to purchase both vested and unvested shares at a price equivalent to the proportional price originally paid by the Plaintiffs.  Stock Restriction Agreements ¶ 2(a).  If the Plaintiffs were terminated without cause, however, AlloCure would be required to pay fair market value to purchase any vested shares owned by the Plaintiffs.  Id. ¶ 2(b).

8

any written agreement or covenant with the Company." Incentive Plan ¶ 2(g)(iv). Thus, the determination whether the Plaintiffs were terminated for cause could turn on whether they performed their obligations under the Consulting Agreements.

The Incentive Plan also provides, however, that "[t]he determination as to whether [the Plaintiffs are] being terminated for Cause shall be made in good faith by the Company and shall be final and binding on the [Plaintiffs]." Id. ¶ 2(g). AlloCure made such a final determination in its December 2006 letters to the Plaintiffs in which it stated: "For purposes of this Stock Restriction Agreement, AlloCure, Inc. will consider your termination <u>not for 'Cause'</u> as defined in the Stock Restriction Agreement." Termination Letters 1 (emphasis added). Because AlloCure has already decided that the termination was not for cause, the only dispute remaining in Count IV is whether AlloCure determined the fair market value of the shares in good faith and, if not, what is the proper measure of damages for such a breach. Neither of these questions requires this Court to address any party's rights or obligations under the Consulting Agreements; Count IV is framed solely by the Stock Restriction Agreements.

Second, AlloCure argues that the arbitration clause must apply to Count IV because the Consulting Extensions and the Stock Restriction Agreements were both executed as part of the Series A Financing of AlloCure and therefore must be considered together.

See AlloCure Opp'n 13-15.  They argue that the Consulting Agreements, Stock Restriction Agreements, and Incentive Plan "cannot be read or understood without the other[s] in the context of this dispute."  Id. at 14.

Regardless of how the three documents must be "understood," arbitration is a contractual arrangement to which the parties must agree, and this Court cannot require the Plaintiffs to arbitrate Count IV unless they have consented to such a course.  See SBC Interactive, Inc. v. Corporate Media Partners, 714 A.2d 758, 761 (Del. 1998) ("A court will not compel a party to arbitrate . . . absent a clear expression of such an intent.").

Here, the arbitration clause is in the Consulting Agreements, not the Stock Restriction Agreements or the Incentive Plan.  Although the clause is undoubtedly broad in scope, by its terms, it applies only to "claim[s] arising out of or relating to" the Consulting Agreements.  Consulting Agreements ¶ 19.  "An arbitration clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement."  Parfi, 817 A.2d at 156.  As discussed above, the Court concludes that Count IV does not implicate the obligations contained in the Consulting Agreements.  Thus, regardless of the context of the various contracts, the arbitration clause cannot reach Count IV.

**IV. CONCLUSION**

For the foregoing reasons, this Court ruled that the arbitration clause in the Consulting Agreements did not apply to Count IV of the Amended Complaint. Accordingly, the Court ALLOWED the Plaintiffs' motion for a preliminary injunction enjoining arbitration of that claim and DENIED the Defendants' motion to compel arbitration.


                                            /s/ William G. Young
                                            William G. Young
                                            District Judge